Case 3:19-cv-00102   Document 55   Filed on 10/27/20 in TXSD   Page 1 of 19

United States District Court
Southern District of Texas
**ENTERED**
October 27, 2020
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

No. 3:19-cv-102

LeDell Coleman

v.

BP Exploration & Production Inc. and Grand Isle Shipyards, LLC

## MEMORANDUM OPINION AND ORDER

Jeffrey Vincent Brown, United States District Judge.

Before the court in this workplace-injury case are two motions for summary judgment, one by each defendant. Dkts. 26, 27. The movants argue that neither can be held liable for the plaintiff's negligence claims because of the "independent contractor" rule, and because the plaintiff has no independent-negligence claims against them. After considering the arguments, the summary-judgment record, and the applicable law, the court agrees that the defendants cannot be held vicariously liable for their respective subcontractors' negligence; and the defendants owed no independent duty to the plaintiff. Accordingly, the court grants both motions.

1

## I.   Background

Shell Pipeline Co. LP operated an oil platform, known as SP89E, off the coast of Louisiana on behalf of the platform's owner, Proteus Oil Pipeline Co., LLC.[1] In 2017, Shell engaged BP Exploration & Production Inc. to complete a construction project that was a part of an expansion of the platform.[2] BP then hired Grand Isle Shipyards, LLC, to manage the construction.[3] Grand Isle in turn subcontracted certain scaffolding work to Brand Energy Services.[4] LeDell Coleman was a scaffold builder for Brand.[5]

Coleman testified that when he arrived at the platform on December 5, 2018, the weather was too poor for any work to be done.[6] As the bad weather persisted, he was confined to an adjacent housing vessel for the next few days.[7] Coleman alleges that BP and Grand Isle soon became eager to make progress on the job in light of the bad-weather delays.[8] So, On December 10, despite still ongoing inclement weather, they required Brand, and thus Coleman, to get to work.[9]

During his shift on the platform, Coleman was tasked with moving heavy, 8-foot long boards to a staging area.[10] Coleman testified that while carrying one of these boards, the wind "got up under it," so he had to "snatch[] it to keep it from

---

[1] Dkt. 26-1, Ex. A, PDF at 6.
[2] *See* Dkt. 26-1, Ex. B, PDF at 39–50.
[3] Dkt 26-1, Ex. C, PDF at 52–96.
[4] *See generally* Dkt. 26-2, Ex. D, PDF at 2–72.
[5] Dkt. 26-2, Ex. F, at 43.
[6] Dkt. 36-1, Ex. A., at 64–66.
[7] *Id.*
[8] *Id.*
[9] *See* Dkt. 1-3, at 3; *see also* Dkt. 36-1, Ex. A, at 111–14.
[10] *See* Dkt 36-1, at 120–21; Dkt. 48-1, at 90.

going overboard."[11] This caused his back to "pop," and then ache. Coleman states that he told his supervisor about the wind and that his back hurt.[12] After he returned to the housing vessel, Coleman showered and went to bed.[13] When he woke up, Coleman explains that he fell from his bed to the floor because a shooting pain traveled from his neck, through his lower back, and down to his left leg, rendering him unable to move.[14] Coleman was then taken to the ship's sick bay and then evacuated.[15] Coleman later filed suit in state court against BP and Grand Isle (collectively, the defendants), alleging negligence and other claims.[16] Grand Isle removed the matter to this court.[17]

The defendants each move for summary judgment against all of Coleman's claims. Dkts. 26, 27. Both argue that they cannot be held vicariously liable for their respective subcontractor's negligence under the "independent contractor" rule; neither are directly liable because they did not owe Coleman any independent duty; and there is no evidence of breach or causation. Coleman responded to both motions. Dkts. 36, 37. The defendants filed replies. Dkts. 38, 40. With the court's leave, Coleman filed a sur-reply to supplement the summary-judgment record with the deposition of his supervisor at the time of the accident. Dkt. 48. With the

---

[11] Dkt. 36-1, at 121.
[12] *Id.* at 131–32, 157.
[13] *Id.* at 132
[14] *Id.* at 143–44; Dkt. 48-1, at 18–20, 50–51.
[15] Dkt. 36-1, at 147–49; Dkt. 48-1, at 20.
[16] *See* Dkt. 1-3. Coleman's original petition included causes of action under the Jones Act, general maritime law, and alleged negligence per se. Coleman agreed to dismiss the Jones Act and maritime claims. Dkt. 26, at 2 (citing Dkt. 21).
[17] Dkt. 1.

3

court's permission, the defendants jointly filed a reply to Coleman's sur-reply. Dkt. 54.

## II.  Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[18] Material facts are those which may affect the outcome of the case, and a fact issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-movant.[19]

The movant may satisfy its summary-judgment burden if it demonstrates the absence of evidence to support the non-movant's case.[20] "If the moving party initially shows the non-movant's case lacks support, 'the non-movant must come forward with "specific facts" showing a genuine factual issue for trial.'"[21]

When deciding a summary-judgment motion, the evidence must be viewed in the light most favorable to the non-movant and "all justifiable inferences are to be drawn in his [or her] favor."[22]

## III.  Analysis

### A. Outer Continental Shelf Lands Act

---

[18] *Shepherd ex rel. Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)).
[19] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018).
[20] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[21] *Renwick*, 901 F.3d at 611 (quoting *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002)).
[22] *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)).

Because the SP89E platform is located on the Outer Continental Shelf off the Louisiana coast, the court has federal jurisdiction under the Outer Continental Shelf Lands Act.[23] The Act further provides that because Coleman's injury occurred on a platform off the Louisiana coast, Louisiana law applies as surrogate federal law unless Louisiana law conflicts with any federal law.[24] The court finds no conflict and so applies Louisiana law to this dispute.

### B. Negligence Claims

Under Louisiana law, a negligence claim requires conducting a "duty/risk" analysis, which entails five elements:

> (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injures (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) whether the plaintiff was damaged (the damages element).[25]

Whether a defendant owed a duty is a question of law for the court.[26] Therefore, to survive summary judgment, Coleman must show that BP and Grand Isle owed him a duty of care and establish specific issues of material fact for negligence's remaining elements. Both BP and Grand Isle contend that Coleman's negligence claims fail because as a matter of law: (1) they cannot be held vicariously

---

[23] 43 U.S.C. § 1333(a)(1).
[24] *Id.* § 1333(a)(2)(A).
[25] *Hicks v. BP Expl. & Prod., Inc.*, 310 F. Supp. 3d 754, 759 (E.D. La. 2018) (quoting *Hanks v. Entergy Corp.*, 944 So. 2d 564, 579 (La. 2006)).
[26] *Mundy v. Dep't of Health & Hum. Res.*, 620 So. 2d 811, 813 (La. 1993).

liable for the negligence of their respective independent contractors; and (2) they cannot be directly liable because they owed no independent duties to Coleman and he fails to raise issues of material fact for the remaining elements of his negligence claim.[27] Coleman responds that BP and Grand Isle have failed to establish all of the elements of the independent-contractor defense; BP and Grand Isle owed him a duty because they were in charge of the platform's safety; BP and Grand Isle exercised operational control over Brand and himself; and he has introduced issues of material facts on the breach and causation elements. The court first considers the independent-contractor exception to vicarious liability and then proceeds to Coleman's independent-negligence claims.

### C. Independent-Contractor Exception to Vicarious Liability

Louisiana law provides that typically a principal may be vicariously liable for the negligence of its employees.[28] However, Louisiana law also provides that "a principal is not liable for the negligent acts of an independent contractor acting

---

[27] The defendants repeatedly ask the court to find large parts of Coleman's and his supervisor's testimony incompetent to establish an issue of material fact. They contend this testimony is "speculative," "conclusory," "unsubstantiated," and list other defects. For purposes of this summary-judgment motion, the court declines to find this testimony incompetent. When reviewing a motion for summary judgment, the evidence is weighed in a light favorable to the non-movant, so the court will view his evidence as true, and all doubts are to be resolved in his favor. *See Hunt v. Cromartie*, 526 U.S. 541, 550–55 (1999). Additionally, other parts of the summary-judgment record, including the deposition testimony of the defendants' representatives, corroborates much of Coleman's cited evidence.

[28] *See Richard v. Hall*, 874 So. 2d 131, 137 (La. 2004) ("Vicarious liability rests in a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities."); *see also* La. Civ. Code Ann. art. 2320 (2020) ("Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.").

pursuant to the contract."[29] "Louisiana law imposes no duty upon a principal to intervene or interject itself to stop the unsafe activities of its independent contractor, even if the principal's intervention could have prevented an accident."[30] The independent-contractor exception to vicarious liability is unavailable, however, in two instances: (1) the work undertaken was intrinsically dangerous or "ultrahazardous," and (2) the defendant gave express authorization for an unsafe practice or exercised operational control over the work.[31] Coleman does not argue that carrying scaffolding board or building scaffolding qualifies as an ultrahazardous or inherently dangerous activity, so the court does not consider that exception.[32]

### 1. Independent-Contractor Relationship and Operational Control

Coleman first suggests that the independent-contractor exception to vicarious liability is an affirmative defense, requiring the defendants to affirmatively prove every "element" of the independent-contractor relationship.[33] This court has found no indication that the independent-contractor exception to vicarious liability is an affirmative defense, though some courts have referred to it

---

[29] *Graham v. Amoco Oil Co.*, 21 F.3d 643, 645 (5th Cir.1994); *see Mack v. CDI Contractors, Inc.*, 757 So. 2d 93, 96–97 (La. Ct. App. 2000); *Ukudi v. McMoran Oil & Gas, L.L.C.*, 587 F. App'x 119, 122 (5th Cir. 2014) (per curiam).

[30] *Galbraith v. Constr. Tech. Servs., Inc.*, No. 13-00449-SDD-RLB, 2015 WL 542305, at *2 (M.D. La. Feb. 10, 2015).

[31] *Cormier v. W & T Offshore, Inc.*, No. 10-1089, 2013 WL 1567406, at *8 (W.D. La. Apr. 12, 2013); *Ainsworth v. Shell Offshore, Inc.*, 829 F.3d 548, 548–50 (5th Cir. 1987).

[32] *See Sims v. Cefolia*, 890 So. 2d 626, 631–32 (5th Cir. 2004); *Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 379 (5th Cir. 2001).

[33] Dkt. 36, at 12–13.

7

as a "rule."[34] Regardless of its label, a principal or employer seeking to avoid vicarious liability through the independent-contractor exception must establish the existence of an independent-contractor relationship between it and the alleged negligent contractor.[35] Coleman lists five factors used under Louisiana law to determine whether there is an independent-contractor relationship:

> 1. There is a valid contract between the parties;
> 2. The work being done is of an independent nature such that the contractor may employ nonexclusive means in accomplishing it;
> 3. The contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered;
> 4. There is a specific price for the overall undertaking; and
> 5. Specific time or duration is agreed upon and not subject to termination at the will of either side without liability for breach.[36]

These factors denote that the independent-contractor inquiry often boils down to the question of whether the employer actually exercised *control* over the contractor's work in a manner that left the contractor "not entirely free to do the work in his own way."[37] If the answer to the control question is "yes," the contractor is not truly "independent." This is why an exception to the independent-contractor

---

[34] *See, e.g.*, *Galbraith*, 2015 WL 542305, at *2.
[35] *Hicks v. BP Expl. & Prod., Inc.*, 310 F. Supp. 3d 754, 760–61 (E.D. La. 2018); *Hickman v. S. Pac. Transp. Co.*, 262 So. 2d 385, 390–91 (La. 1972).
[36] *Hicks*, 310 F. Supp. 3d at 760 (quoting *Ledent v. Guar. Nat. Ins. Co.*, 723 So. 2d 531, 537–38 (La. Ct. App. 1998)).
[37] *Fruge ex. rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 561 (5th Cir. 2003); *Hickman*, 262 So. 2d at 390–91 ("The law further recognizes that inquiry to determine whether a relationship is that of independent contractor or that of mere servant requires, among other factors, the application of the principal test: the control over the work reserved by the employer. In applying this test[,] it is not the supervision and control which is actually exercised which is significant, the important question is whether, from the nature of the relationship, the right to do so exists.").

rule is "operational control": if the employer actually "determined the method by which the [purported independent contractors] were to perform their work and instructed them accordingly," then the purported independent contractor is better characterized as an employee, so the normal rule of vicarious liability should obviously apply.[38] Thus, answering whether there was an independent-contractor relationship will often correspondingly answer whether the principal enjoyed "operational control."[39]

When considering the summary-judgment evidence, it's clear that Grand Isle was BP's independent contractor, and, in turn, Brand was Grand Isle's independent contractor. Correspondingly, BP did not control how Grand Isle or Brand completed their work, nor did Grand Isle control Brand. For the Brand-BP relationship, it matters not that Brand did not directly have a contract with BP, as Brand's contract with Grand Isle and the lack of evidence of operational control by either BP or Grand Isle establishes that status.[40]

In the Master Agreement for Provision of Services between BP and Grand Isle, Grand Isle was explicitly labeled an "independent contractor," and Grand Isle

---

[38] *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471-72 (5th Cir. 1989); *see Fruge*, 337 F.3d at 561.

[39] *Arroyo v. E. Jefferson Gen. Hosp.*, 956 So. 2d 661, 664 (La. Ct. App. 2007) ("The existence of an independent contractor agreement is not necessarily dispositive of the issue of whether a doctor is an independent contractor, as opposed to an employee of a hospital. The courts will inquire as to the real nature of the relationship and the degree of control exercised or ability of control by the hospital over the doctor's activities."); *Mack v. CDI Contractors, Inc.*, 757 So. 2d 93, 97 (La. Ct. App. 2000) ("The crux of this issue is the degree of control . . . .").

[40] *See Mack*, 757 So. 2d at 97 (holding that a drywall subcontractor, who was hired by an independent painting contractor working for CDI, also qualified as an independent contractor for CDI because CDI had no control over the drywaller while the subcontractor worked on its portion of the job).

agreed that it "shall control the performance of the work and shall be responsible for its results."[41] Coleman also cites the BP-Shell contract, which provided that BP would ensure that the SP89E Expansion Project be conducted safely and that all subcontractors would comply with safety requirements, to argue that BP assumed responsibility for any negligence that occurred on the platform.[42] However, when it comes to determining whether BP enjoyed operational control over either Grand Isle or Brand, the BP-Shell contract is inconsequential; it reflects only the contractual obligations between BP and Shell.

Similarly, the Grand Isle-Brand Master Service Agreement provides that Brand understands that it "is an independent contractor" and that none of Brand's employees were to be considered Grand Isle's employees.[43] Further, Grand Isle did not retain the right to control Brand's method of completing the job: "Grand Isle shall designate the services it desires to be performed and the ultimate results to be obtained, but shall leave to [Brand] the methods and details of performance . . . ."[44] While Coleman is correct that there was no contract between BP and his employer (Brand), the Master Agreement for Provision of Services between BP and Grand Isle provides that Grand Isle's subcontractors were Grand Isle's responsibility.[45] Moreover, Brand agreed in the Grand Isle-Brand contract to

---

[41] Dkt. 26-1, Ex. C § 13.0; *see also id.* §§ 4.2, 4.3; *see Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997); *Hicks*, 310 F.Supp.3d at 761.
[42] *See* Dkt. 36-2, Ex. B, at 46–49.
[43] Dkt. 26-2, Ex. D § 2.
[44] *Id.*
[45] Dkt. 26-1, Ex. C § 24.0.

10

assume "all obligations and responsibilities and duties that Grand Isle has, by the Contract Documents, assumed towards [BP]."[46]

Most importantly, the summary-judgment evidence plainly shows that BP did not actually control how Grand Isle conducted its work; nor did Grand Isle actually control Brand's work. As evidence of actual control, Coleman cites deposition testimony stating that: (1) BP trained Grand Isle and other subcontractors on how to safely work on the platform and required contractors to adopt their safety rules;[47] (2) BP reviewed all job-safety-environmental-assessment reports completed by Grand Isle and Brand;[48] (3) Brand took orders directly from on-site BP and Grand Isle personnel;[49] (4) BP decided when to transfer the workers to the platform; (5) Brand relied on BP's weather data to determine when to work;[50] (6) BP personnel supervised the work performed by Grand Isle and Brand, and Grand Isle also has a construction supervisor on-site;[51] and (7) Grand Isle provided Brand with the materials and tools it needed to build the scaffolding.[52]

This evidence, even when taken as true and viewed in a light favorable towards Coleman, does not create an issue of material fact over whether any party instructed any other on *how* to accomplish their respective work.

---

[46] Dkt. 26-2, Ex. D § 1.4.
[47] Dkt. 36-2, Ex. B, at 99–101.
[48] Dkt. 36-3, Ex. C, at 65, 166; *see also* Dkt. 36-2, Ex. B, at 65–67.
[49] *See* Dkt. 36-1, Ex. A, at 217–18.
[50] Dkt. 36-2, at 69–71; Dkt. 48, at 5–9.
[51] *See* Dkt. 36, at 10–11; Dkt. 37, at 17.
[52] Dkt. 37, at 16 (citing Dkt. 37-3, Ex. C, at 56–57).

For example, the training and resources given to Brand is not evidence that BP or Grand Isle instructed Brand on how to accomplish its work. Indeed, the training that BP gave the contractors when they arrived at the platform educated them on general issues of working and living on the platform, such as where workers would sleep—but not on how to build scaffolding.[53] In that same vein, BP supplying Brand with weather information and transporting the contractors to the platform does not mean it controlled how work was done. The same is true of Grand Isle's provision of materials and tools to Brand. Even if the materials and tools are necessary to accomplish the job, Brand still had to decide *how* to perform the task.[54]

Coleman argues that BP and Grand Isle's decision to send Brand to the platform was an "authorization of an unsafe work practice" because they knew the weather conditions were hazardous.[55] Again, however, even assuming BP or Grand Isle told Brand to work that day because the weather conditions were safe,[56] that decision does not demonstrate BP or Grand Isle controlled the details of how Brand accomplished its work.[57] Likewise, Coleman's testimony that Brand was told

---

[53] *See* Dkt. 36-1, at 56–58 (Coleman's deposition describing the platform orientation as "a rundown" of the platform). BP suggests that it cannot be held responsible for any training Grand Isle gave to Coleman, and Grand Isle argues that Coleman admits that he received no safety training from either besides the initial platform orientation. Dkt. 40, at 8.

[54] *See Fruge ex. rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 561 (5th Cir. 2003).

[55] *See Coulter v. Texaco, Inc.*, 117 F.3d 909, 911–12 (5th Cir. 1997); *Cormier v. W & T Offshore, Inc.*, No. 10-1089, 2013 WL 1567406, at*12 (W.D. La. Apr. 12, 2013).

[56] BP and Grand Isle argue it was solely Brand's decision to work on the platform that day. Dkt. 54, at 5–7 (citing Dkt. 48-1, at 17).

[57] *See Ukudi v. McMoran Oil & Gas, L.L.C.*, 587 F. App'x 119, 122–23 (5th Cir. 2015) (per curiam).

12

by Grand Isle *what* to do during the shift is not evidence of *how* to accomplish the requested task. Coleman's supervisor's testimony confirms this: while Grand Isle told him what Brand should work on that day, Grand Isle did not tell him how to accomplish the job.[58]

Additionally, a principal may take "interest in the safety of the employees of its independent contractors," and this can manifest through a "demand in its contract that an independent contractor develop safe work procedures without triggering the operational control exception."[59] Stemming from the interest in safety, merely encouraging compliance with safety requirements is not evidence of "direct supervision over the step-by-step process of accomplishing the work."[60] Therefore, BP and Grand Isle's completing and reviewing job-safety-assessment reports and requiring subcontractors to comply with safety regulations is not evidence of control without additional evidence of their instructions on how to accomplish the work.[61]

Finally, courts have consistently held that mere supervision or presence of the principal's employees does not constitute operational control.[62]

Accordingly, the court finds as a matter of law that Grand Isle and Brand qualify as BP's independent contractors, and Brand similarly qualifies as Grand

---

[58] Dkt. 48-1, at 89; *see Fruge*, 337 F.3d at 564–65; *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471–72 (5th Cir. 1989).
[59] *Voces v. Energy Res. Tech., G.O.M., L.L.C.*, 704 F. App'x 345, 350–51 (5th Cir. 2017) (per curiam).
[60] *Ukudi*, 587 F. App'x at 122.
[61] *See Voces*, 704 F. App'x at 351.
[62] *Ukudi*, 587 F. App'x at 123; *Iglesias v. Chevron U.S.A. Inc.*, 656 F. Supp. 2d 598, 601 (E.D. La. 2009) ("The mere right of supervision is not sufficient to exercise operational control.").

Isle's independent contractor. Additionally, BP did not exercise operational control over Grand Isle or Brand, nor did Grand Isle exercise operational control over Brand.

And those findings lead the court to conclude, to the extent Coleman seeks to hold BP vicariously liable for the negligence of Grand Isle or Brand, Louisiana's independent-contractor rule shields BP from that liability. Likewise, the independent-contractor rule shields Grand Isle from liability for any of Brand's negligence.

### D. Independent Negligence Claims

The court next considers whether there are issues of material fact over Coleman's independent-negligence claims against the defendants.[63]

BP and Grand Isle contend that they owed Coleman no independent duties because they did not contractually assume any duties and did not "create" the allegedly hazardous weather that caused Coleman's injury or cause him to be exposed to it. Coleman counters that the defendants owed a duty because they were generally responsible for maintaining safety on the platform, and they did cause him to work under a "dangerous hazard"—the "same windy conditions that prevented work on the days leading to the date of the subject incident."[64]

---

[63] *See Iglesias*, 656 F. Supp. 2d at 601; *see also Ellis v. Chevron U.S.A. Inc.*, 650 F.2d 94, 97 (5th Cir. 1981).

[64] Dkt. 37 at 34.

14

"Duty varies depending on the facts, circumstances, and context of each case and is limited by the particular risk, harm, and plaintiff involved."[65] No matter the context, a defendant's universal duty is to "use reasonable care so as to avoid injury to another."[66] "Whether the defendant breached [a] duty and whether that breach was a cause in fact of plaintiff's injuries are factual questions to be determined by the factfinder."[67] But whether a duty exists at all is a question for the court.[68]

Louisiana law provides that generally the "owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm."[69] More specifically, in the principal-independent-contractor context, the principal need not "take affirmative steps to ensure the safety of a contractor's employees, but it may assume such a duty by contract or by later going beyond the contract and voluntarily policing the worksite for safety problems."[70] Courts also consider whether the hazard was created by the principal or the independent contractor.[71]

The court finds the reasoning in *Galbraith v. Construction Technical Services, Inc.* persuasive.[72] In that case, Waveland Services was engaged as an

---

[65] *Hicks v. BP Expl. & Prod., Inc.*, 310 F. Supp. 3d 754, 759 (E.D. La. 2018) (quoting *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir. 1994)).
[66] *Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1231 (La. 1998).
[67] *Hicks*, 310 F. Supp. 3d at 759 (quoting *Hanks v. Entergy Corp.*, 944 So. 2d 564, 579 (La. 2006)).
[68] *Mundy v. Dep't of Health & Hum. Res.*, 620 So. 2d 811, 813 (La. 1993).
[69] *Manning v. Dillard Dep't. Stores, Inc.*, 753 So. 2d 163, 165 (La. 1999).
[70] *Ukudi*, 587 F. App'x at 123.
[71] *Thomas v. Burlington Res. Oil and Gas Co.*, No. Civ. A. 99-3904, 2000 WL 1528082, at *2 (E.D. La. 2000).
[72] *Galbraith v. Constr. Tech. Servs., Inc.*, No. 13-00449-SDD-RLB, 2015 WL 542305, at *2 (M.D. La. Feb. 10, 2015).

independent contractor for Chevron's spar production platform, where it performed sandblasting and painting work.[73] The plaintiff, David Galbraith, was Waveland's employee, and he injured his ankle while working on Chevron's spar during inclement weather.[74] Galbraith asserted negligence claims against Chevron—including for requiring him to work in inclement weather—the central independent negligence allegation that Coleman asserts. The court granted summary judgment because it concluded that Chevron did not owe Galbraith a duty because (1) Chevron obviously did not "create" the weather, and (2) there was no evidence Chevron required the plaintiff to continue working in the inclement weather. [75]

Coleman's allegations are not perfectly analogous to Galbraith's. Coleman argues that BP and Grand Isle were negligent for *requiring* Brand to conduct scaffolding work under hazardous weather conditions—not that they were negligent for failing to *stop* the work in progress because unsafe weather conditions developed.[76] But the issue of whether the defendants had the power to control the decision—i.e. to either start or stop work—is key to the question of whether a duty existed. Here, the evidence establishes that the defendants merely influenced Brand's decision to work on the day of Coleman's injury—they did not actually require it.

---

[73] *Id.* at *1.
[74] *Id.* at *1.
[75] *Id.* at *2.
[76] *See id.*

16

Coleman's supervisor testified that he was responsible for deciding whether the conditions were safe enough to proceed to work.[77] Coleman's supervisor also testified, however, that he relied on what Grand Isle was doing and what the captain of the vessel told him about wind speeds when making that decision.[78] Yet, even if he relied on what Grand Isle was doing and BP's weather data, Coleman does not provide evidence to show that either BP or GIS ultimately controlled the decision to commence work.

Other evidence reinforces that the decision to work was solely Brand's. After being transferred to the platform, Coleman's supervisor had to complete a "Job Safety Environmental Assessment" prior to beginning the shift.[79] In the assessment, Coleman's supervisor affirmed that he reviewed the work site for current conditions, including the weather.[80] With Coleman's input, his supervisor affirmatively checked a box that stated that they considered whether "now [is] the right time to [do] the work," with "weather conditions" being one of the factors considered in the assessment. Coleman's supervisor further testified that he never felt that the weather conditions on the platform were unsafe, but he did note that Coleman came up to him while they were working and said, "it was too windy," which prompted Coleman's supervisor to ask "the guy that was in charge about

---

[77] Dkt. 48-1, at 17. Coleman's supervisor testified that Brand's policy was to not work if the winds exceeded 25 miles per hour. *Id.* at 13.

[78] *Id.* at 17–18 ("I didn't think it was unsafe. I mean, there was at times that the winds got a little high; but it was--from what I was told from the captain and all, the winds w[ere] under 25 miles per hour. GIS was working, and we w[ere] able to go to work also.").

[79] Dkt. 36-3, Ex. C, at 152–58.

[80] *Id.*

17

what the wind speeds [w]ere." Coleman's supervisor continues that "the guy in charge" told him the wind speed was "like, 22" so they were "able still to go to work."[81] This testimony shows that at all times, Coleman's supervisor controlled his work crew's presence at the job site once they arrived. Even assuming that "the guy in charge" was a BP or Grand Isle employee, whether the weather information Coleman's supervisor received merited continuing work or punching it in was not up to the defendants. Even more, all contractors had the right to stop work if they felt the conditions were perilous.[82]

Accordingly, because the defendants did not control whether and when Coleman was to work, they did not owe an independent duty to intervene or interject to stop Coleman from working on the day he was allegedly injured, even if their intervention would have prevented Coleman's injury.[83] Moreover, the defendants' duty to ensure the safety of the premises is not implicated because they did not create the alleged hazardous condition—the excessively windy weather.[84]

Because the court concludes that the defendants did not owe an independent duty to Coleman, it will not consider whether there are issues of material fact on the breach and causation grounds.

---

[81] Dkt. 48-1, at 17.
[82] *Id.* at 17, 34; Dkt. 36-1, at 101, 112–13.
[83] *Galbraith*, 2015 WL 542305, at *2.
[84] *Id.*

\* \* \*

In sum, to the extent Coleman seeks to recover through vicarious liability, the defendants are protected by the independent-contractor rule. Additionally, because there is no evidence that either BP or Grand Isle controlled Brand's decision to work during the windy weather on the day of Coleman's injury, and because they did not create the hazardous condition at issue, they did not owe him any independent duty. Accordingly, the court grants BP's motion for summary judgment (Dkt. 26) and Grand Isle's motion for summary judgment (Dkt. 27) and dismisses the plaintiff's claims with prejudice.

Signed on Galveston Island on this, the 27th day of October, 2020.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE